IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:18-cv-295

INVENTIV HEALTH CONSULTING, INC.,

      Plaintiff,

v.

ALAN D. FRENCH, JR., PRIYA GOGIA,
JASON DEBASITIS, and JIERU ZHENG,

      Defendants.

## COMPLAINT

Plaintiff inVentiv Health Consulting, Inc. ("inVentiv") hereby brings this action for injunctive relief and damages against its former employees, Defendants Alan D. French, Jr. ("French"), Priya Gogia ("Gogia"), Jason Debasitis ("Debasitis"), and Jieru Zheng ("Zheng") (collectively, "Defendants"), for: (1) breach of contract; (2) tortious interference with contract; (3) tortious interference with advantageous business relations; (4) misappropriation of trade secrets under federal and state law; (5) unfair and deceptive trade practices; (6) civil conspiracy; (7) breach of fiduciary duty; and (8) constructive fraud. In support of its claims, inVentiv states the following:

## NATURE OF ACTION

1.     This case arises from Defendants' conspiracy to unlawfully compete with Plaintiff inVentiv using its confidential customer information, in violation of Defendants' employment agreements and state and federal law governing trade secrets and unfair competition.

2.     inVentiv has a profitable and growing consulting relationship with certain clients in the pharmaceutical industry. In 2014, Defendants were employed by inVentiv, and were responsible for servicing two of inVentiv's top pharmaceutical clients ("Clients A and B" or the

"Clients").[1]   Defendant French was charged with leading the dedicated team, comprising Defendants Gogia, Debasitis, Zheng, and certain other employees.  In their roles, Defendants were entrusted with inVentiv's confidential information and substantial customer goodwill. Accordingly, as a condition of their employment, Defendants were each required to – and did – sign an employment agreement with inVentiv containing confidentiality, noncompete, nonsolicit, and no-hire restrictions.

3.       In November 2015, while still employed by inVentiv and without inVentiv's knowledge, French co-founded a competing company:  Equitas Life Sciences, LLC ("Equitas"). French co-founded Equitas with Dennis Meletiche ("Meletiche"), a former employee of Client A with whom French had regular contact through his role at inVentiv while servicing Client A.

4.       During the first half of 2016, while still employed by inVentiv and without inVentiv's knowledge, French worked with Meletiche to build Equitas into a functioning competitor of inVentiv.  During this time, French also secretly transitioned client work (including work for Clients A and B) from inVentiv to Equitas, and performed the work through Equitas.  To cover his tracks and explain away corresponding declining revenues, French told his superiors at inVentiv that the Clients' need for consulting services had simply diminished.

5.       Also during the first half of 2016, nearly all of French's team members – including Gogia, Debasitis, Zheng, and another employee, Summer Atkinson ("Atkinson")[2] – resigned from inVentiv.  Gogia, Debasitis, Zheng, and Atkinson each cited personal reasons as the basis for their resignations and none told inVentiv that they planned to go work with French at Equitas.  That is,

---

[1] To maintain confidentiality, this pleading does not name the individual clients, and pseudonyms will be used instead until an appropriate protective order is in place.

[2] French, Gogia, Debasitis, Zheng, and Atkinson may hereinafter be referred to collectively as the "Former Employees."

however, precisely what happened; the Former Employees left inVentiv to work for Equitas and secretly transitioned two of inVentiv's top clients (Clients A and B) to Equitas using inVentiv's confidential customer information. Indeed, just two days before his resignation, French accessed myriad confidential documents using his inVentiv computer and inserted a thumb drive into the computer immediately afterwards, presumably so that he could take and use inVentiv's confidential information on behalf of Equitas.

6.     Defendants' coordinated effort to establish a competing company and secretly divert away inVentiv's clients using inVentiv's trade secrets violates Defendants' employment agreements with inVentiv, as well as state and federal law governing trade secrets and unfair competition.

7.     inVentiv, therefore, seeks injunctive relief to protect its trade secrets, other confidential and proprietary business information, and business relationships from the Defendants' unfair competition and otherwise wrongful conduct. inVentiv also seeks damages flowing from Defendants' misconduct, in an amount to be determined at trial, and all other available relief.

## PARTIES

8.     Plaintiff inVentiv Health Consulting, Inc. is a North Carolina corporation with its principal place of business in Raleigh, North Carolina. inVentiv provides strategic management consulting services to biopharmaceutical and medical technology companies. inVentiv is formerly known as Campbell Alliance Group, Inc., and is now known as Syneos Health after it was rebranded in January 2018 following a merger.

9.     Defendant Alan D. French, Jr. is an individual who resides at 61 Pearl Street, Unit 30, Essex Junction, Vermont 05452.

10.     Defendant Priya Gogia is an individual who resides at 400 East 77th Street, Apartment 8D, New York, New York 10075.

11.     Defendant Jason Debasitis is an individual who resides at 1 Oak Terrace, Apartment 106, Somerville, Massachusetts 02143.

12.     Defendant Jieru Zheng is an individual who resides at 100 United Nations Plaza, Apartment 46D, New York, New York 10017.

## JURISDICTION & VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  There is complete diversity of citizenship between the Plaintiff and Defendants because no Defendant is a citizen of North Carolina, the state of inVentiv's citizenship.  The amount in controversy in this action exceeds $75,000 exclusive of interests and costs.

14.     This Court has personal jurisdiction over the Defendants based on the forum selection clauses contained in their employment agreements with inVentiv designating Wake County, North Carolina, as the exclusive forum as follows:  "All disputes pertaining to this Agreement shall be decided exclusively by a state or federal court located in Wake County, North Carolina, and Employee hereby consents to personal jurisdiction of such courts." Indeed, Plaintiff originally filed suit against French, Gogia, and Debasitis (among others) in Massachusetts, and those three Defendants were dismissed from that action based on their contention that the forum selection clauses contained in their employment agreements mandated that any action brought against them by inVentiv must be brought in this forum.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3) because Defendants consented to litigation in Wake County, North Carolina, and are subject to personal jurisdiction in this judicial district.

## FACTUAL BACKGROUND

### I.    inVentiv's Business.

16.    Plaintiff inVentiv is the strategic management consulting business unit of inVentiv Health, Inc.  inVentiv (now known as Syneos Health, as previously alleged herein) is an industry leader in biopharmaceutical and medical technology consulting, specializing in the pharmaceutical and biotech industry.

17.    inVentiv's clients primarily include pharmaceutical/biotechnology companies, medical device companies and diagnostics companies located throughout North America, Europe and Japan.  inVentiv also provides consulting services to contract research organizations, contract sales organizations, healthcare information technology companies, industry/trade organizations, and healthcare providers.

18.    inVentiv's consulting services cover new product planning for development-stage assets, launch planning for assets in the critical product launch window, strategy development and tactical solutions for in-line products, portfolio strategy, and organizational development. inVentiv also assists its clients with the development of commercialization strategy and market development plans for their new products.

19.    inVentiv fosters – and has invested considerable amounts of time, money and effort maintaining – goodwill with its clients through its development of lasting relationships.  In fact, more than 85 percent of inVentiv's business comes from satisfied repeat clients.

### II.    inVentiv's Confidential and Proprietary Information.

20.    inVentiv has, over many years of effort and great expense, developed, accumulated, maintained, and refined trade secrets and other confidential and proprietary information concerning, among other things:  business plans, account plans, business policies, client proposals, client deliverables, financial plans and forecasts, research, pricing information, business forecasts,

Case 5:18-cv-00295-D   Document 1   Filed 06/22/18   Page 5 of 35

product information, expert data and reports, business strategies, statements of work, market access strategies, value propositions, client and prospect lists and information, customer contact details, client usage, data sources, industry and company analyses, market information and analysis, methodologies, templates, techniques, and other information relating to inVentiv, its clients (including information regarding its customers' needs and preferences, and how inVentiv addressed or planned to address those needs and preferences, as well as customer-specific pricing structures), and its contractors (collectively, "Confidential Information") to help its employees provide services to inVentiv's clients.

21.     inVentiv's Confidential Information is not generally known to the public, nor is it readily ascertainable. Similarly, inVentiv's Confidential Information is not shared with clients, potential clients, or any other third parties.

22.     inVentiv's Confidential Information provides inVentiv with a significant advantage over competitors who do not know or use the information.

23.     inVentiv has recognized (and continues to recognize) the paramount importance of safeguarding its Confidential Information and has taken numerous steps to safeguard and limit access to such information.

24.     Among other things, inVentiv requires almost all of its employees to sign employment agreements containing confidentiality, noncompete, and/or nonsolicit covenants.

25.     inVentiv also maintains a policy in its personnel manual that specifically requires the confidential treatment and protection of inVentiv's Confidential Information.

26.     inVentiv protects electronically-stored instances of its Confidential Information on secure, password-protected computer systems.

27.     inVentiv also protects its Confidential Information by terminating employees'

electronic access to its systems immediately upon termination of employment, which it did with respect to each of the Former Employees.

28.     To further protect its information, inVentiv requires all employees to return all inVentiv property and information including, but not limited to, electronic devices, storage devices, physical documents, and any electronic copies of inVentiv information promptly upon termination of employment.

29.     As former employees of inVentiv, each of the Former Employees was routinely provided with relevant Confidential Information to enable him or her to efficiently service inVentiv's clients and to develop new business on behalf of inVentiv.

**III.     The Former Employees' Roles at inVentiv and inVentiv's Goodwill.**

30.     Defendant French was a managing director at inVentiv.  In his role, French led a team of employees including the Former Employees, among several others.   The Former Employees directed their work for inVentiv into Massachusetts.

31.     Together, French and his team were responsible for developing and maintaining relationships with certain of inVentiv's clients, particularly Clients A and B.

32.     The Former Employees were compensated to build and fortify existing client relationships and goodwill using inVentiv's Confidential Information.  French, for his part, earned an annual salary of approximately $300,000 (later pro-rated for his part time schedule), and, in 2016, inVentiv paid him a bonus of approximately $200,000.

33.     With respect to the clients they serviced, French and his team were the face of inVentiv to those clients.

34.     With respect to Clients A and B, French served as the Clients' primary point of contact at inVentiv.  He sold and ran projects for the two Clients and was the day-to-day project

lead. In this regard, inVentiv entrusted French with special confidence, allowing him to take lead on all client-related projects as well as control and influence inVentiv's communications with and decision-making with respect to Clients A and B. Indeed, French dominated inVentiv's relationship with the Clients, as no other leader at inVentiv had material contact with Clients A and B for a substantial period other than French.

35. During French's tenure at inVentiv, Clients A and B both had Master Services Agreements with inVentiv. inVentiv rendered services to the Clients under the Master Services Agreements pursuant to a series of so-called "statements of work" thereunder (or "SOW").

36. The Clients generated substantial revenue for inVentiv pursuant to their respective Master Services Agreements. For example, during a period when French was the primary point of contact for the Clients (2013 through 2016), the two Clients generated several million dollars in revenue for inVentiv pursuant to a series of SOWs issued in connection with their respective Master Services Agreement. During that period, Client A was inVentiv's second largest client in terms of annual revenue to inVentiv.

37. Although French and his team serviced Clients A and B (and were the face of inVentiv to them), inVentiv's contractual and business relationship with both Clients preceded the Former Employees' involvement with the Clients. Both Clients were assigned to French by one of his former supervisors at inVentiv.

38. Indeed, inVentiv had developed and cultivated its relationships with the Clients over the course of years and, without the time and effort expended by inVentiv to develop such goodwill, the Former Employees could not have been successful with those accounts.

39. However, as the face of inVentiv to the Clients, the Former Employees were in a position to unfairly take those customer relationships from inVentiv, using inVentiv's goodwill

and Confidential Information, and move them to Equitas, thereby causing substantial harm to inVentiv.

## IV.     The Former Employees' inVentiv Employment Agreements.

40.     As a condition of their employment or continued employment by inVentiv, and in exchange for substantial monetary compensation and other benefits, each of the Former Employees was required to sign, and did sign, an employment agreement containing restrictive covenants that specifically address the confidentiality and protection of inVentiv's information, as well as inVentiv's customer relationships and goodwill.  True and accurate copies of the Defendants' employment agreements ("Defendants' Agreements") are attached hereto as <u>Exhibit 1</u>.  A true and accurate copy of Atkinson's employment agreement ("Atkinson's Agreement") is attached hereto as <u>Exhibit 2</u>.

41.     On information and belief, the Defendants each knew about each other's and Atkinson's employment agreements and the restrictive covenants contained therein.  Specifically, among other things, Defendants signed identical agreements and worked together closely on a team with each other and Atkinson.

42.     Each of the Former Employees was also required to, and did, read and acknowledge inVentiv's personnel manual containing policies designed to protect inVentiv's Confidential Information.

### *Defendants' Employment Agreements*

43.     Under the Defendants' Agreements, during their inVentiv employment and for one year after their termination (the "Noncompete Period"), Defendants were prohibited from competing with inVentiv in certain territories.  (*See* Ex. 1, ¶¶ 4.6, 4.7, 4.2.)  The Defendants' Agreements define the noncompete territories to include Massachusetts and "any city, metropolitan area, county (or similar political subdivisions in foreign countries)" in which

Defendants provided or supervised the provision of services during the last year of their inVentiv employment. (*See id.*, ¶ 4.2(e).)

44. Also, during the Noncompete Period, Defendants' Agreements specifically prohibited Defendants from providing competing services to any of inVentiv's clients or prospective clients (a) with whom Defendants had any contact on behalf of inVentiv during the last year of their inVentiv employment *or* (b) regarding whom Defendants had significant exposure to inVentiv's Confidential Information. (*See id.*, ¶¶ 4.6, 4.2.)

45. Under Defendants' Agreements, during Defendants' employment and for eighteen (18) months after their termination (the "Nonsolicitation Period"), Defendants were prohibited from directly or indirectly, on their own behalf or on behalf of any third party, soliciting or calling upon any inVentiv client or prospective client (a) with whom Defendants had any contact on behalf of inVentiv during the last year of their inVentiv employment *or* (b) regarding whom Defendants had significant exposure to inVentiv's Confidential Information during the last year of their inVentiv employment. (*See id.*, ¶¶ 4.3, 4.2.)

46. Also, during the Nonsolicitation Period, Defendants' Agreements prohibited Defendants from directly or indirectly, on their own behalf or on behalf of any third party, hiring, calling upon, or soliciting any individual who had been an inVentiv employee during the preceding year. (*See id.*, ¶¶ 4.4, 4.2.)

47. Defendants agreed that the Noncompete and Nonsolicitation Periods would not run during any period during which Defendants were in breach of their relative restrictive covenants. (*See id.*, ¶ 4.2(c) and (d).)

48. In Defendants' Agreements, Defendants further agreed that, during and after their inVentiv employment, they would keep inVentiv's Confidential Information in the strictest

confidence and, absent inVentiv's prior written consent, would not disclose inVentiv's Confidential Information or use its Confidential Information for their own benefit or the benefit of any other party.  (*See id.*, ¶ 3.)

49.    Defendants also agreed that, upon their termination, they would promptly return inVentiv's Confidential Information to inVentiv.  (*See id.*, ¶ 3.3.)

50.    Defendants agreed that the restrictions set forth in Defendants' Agreements were fair and reasonably required to protect inVentiv's business interests.  (*See id.*, ¶ 6.)

51.    Defendants further agreed that, in the event of their breach or threatened breach of the provisions, above, inVentiv would be entitled to injunctive relief (without bond), as well as the recovery of attorneys' fees and costs.  (*See id.*, ¶ 7.3.)

52.    The Defendants' Agreements contain choice of law provisions subjecting the agreements to the laws of North Carolina.  The Defendants' Agreements also contain choice of forum provisions that designate Wake County, North Carolina, as the exclusive forum for disputes "pertaining to" the agreements as follows:  "All disputes pertaining to this Agreement shall be decided exclusively by a state or federal court located in Wake County, North Carolina, and Employee hereby consents to personal jurisdiction of such courts."  By executing the agreements, Defendants expressly consented to personal jurisdiction of courts therein.  (*See id.*, ¶ 7.6.)

### *Atkinson's Employment Agreement*

53.    Similar to Defendants, Atkinson's Agreement prohibited her from competing with inVentiv during her employment.  (*See* Ex. 2, ¶ 3(a).)

54.    Atkinson's Agreement also prohibited her, during her employment and for one year afterwards ("Atkinson's Nonsolicitation Period"), from directly or indirectly – alone or in conjunction with any other person or entity – soliciting, selling, or providing any competitive services to any client or potential client of inVentiv (a) with whom she had direct contact within

the last year of her inVentiv employment or (b) regarding whom she learned Confidential Information during the last year of her inVentiv employment. (*See id.*, ¶ 3(b).)

55. Also during Atkinson's Nonsolicitation Period, Atkinson's Agreement prohibited her from hiring, soliciting, or attempting to solicit any inVentiv employee. (*See id.*)

56. Atkinson also agreed that she would not, during or after her employment, make any unauthorized use or disclosure of inVentiv's Confidential Information. (*See id.*, ¶ 2.)

57. Atkinson's Agreement is governed by the laws of New Jersey and selects New Jersey as the exclusive jurisdiction for any dispute "relating to" the agreement. (*See id.*, ¶ 7.)

## V. French Secretly Launches and Operates Equitas While Employed by inVentiv.

58. On November 3, 2015, while French was still working for inVentiv and without inVentiv's knowledge, French and Meletiche incorporated and operated Equitas in Massachusetts. Meletiche is a former employee of Client A with whom French had regular contact (and developed substantial goodwill on behalf of inVentiv) through his role at inVentiv servicing Client A.

59. According to Equitas' Application for Registration filed with the Massachusetts Secretary of the Commonwealth's office, French and Meletiche were the founding managers of Equitas. A copy of Equitas' Application for Registration is attached as Exhibit 3.

60. According to Equitas' Application for Registration, its focus is "[c]onsulting in the life sciences industry."

61. According to publicly-available information, as recently as February 22, 2017, Meletiche's home address in Cambridge, Massachusetts was listed as Equitas' principal place of business. Therefore, upon information and belief, Meletiche's role in Equitas is not limited to his position as a founding manager.

62. According to publicly-available information (contained in GoDaddy.com, LLC's

WHOIS database), the internet domain name "*equitasls.com*" was created on December 3, 2015.

63.     According to publicly-available information, on December 17, 2015, Equitas applied for an H1B Visa to permit the hiring of a foreign worker to fill a Managing Director role for Equitas.  In Equitas' application, it listed Meletiche's home as its business address.

64.     On March 22, 2016, while French was still working for inVentiv, an employee of Client A sent an email to French.  The email was not directed to French's inVentiv email address. Instead, the email was delivered to *adf@equitasls.com*, French's then-email address at Equitas.  A redacted copy of this March 22, 2016, email to Defendant French is attached hereto as Exhibit 4 (the "March Email").

65.     The March Email demonstrates that French was performing work for Client A on behalf of Equitas, in competition with inVentiv (and specifically providing the same type of services that inVentiv otherwise would have been providing to Client A pursuant to its Master Services Agreement), at the same time that French was employed by inVentiv.

66.     French did not seek, much less obtain, authorization from inVentiv to work on behalf of Equitas while he was employed by inVentiv, nor did he seek or obtain authorization to perform work on the side for one of inVentiv's most lucrative clients.

67.     On May 25, 2016, Equitas posted a classified ad in the Daily Record from Morristown, New Jersey, requesting applicants for a Managing Director position.  The ad reads as follows:

MANAGING DIRECTOR Manage/lead book of bus. & grow book of bus. by building strong
    relationships w/clients, leading the bus. dvlpmt process, & securing follow- on
    opportunities. Lead project delivery by overseeing overall project execution, providing
    project guidance to project teams, & managing prof'l, positive, & mature interactions
    w/clients. Take responsibility for career advising to consulting staff team members as a
    Dvlpmt Coach by providing constructive feedback on project deliverables & client/team
    interactions, proactively seeking growth opportunities for team members, & dvlpg training
    materials. Enhance awareness of Equitas in the marketplace via speaking engagements,

client meetings, publications, & participation in conferences & symposiums for prof'l knowl. sharing. Serve as a subject- matter expert at global pricing & mrkt access (incl European, Asian, & Latin American mrkts) w/in Equitas to inform various projects. Req. Master deg in health policy, healthcare mgmt, public health, health econ, pharmacy/biotech, bus. admin, or a relevant discipline w/a min. 6 yrs mgmt consulting exp focusing on pharmaceutical/biotech industry incl 3 yrs of project team leadership exp. Job is located at Morris County, NJ. Apply to: Equitas Life Sciences, LLC, 30 Cottage St., #30, Cambridge, MA 02139. Attn: HR. You may also email your cover letter & res. to rhiannon@morecruiting.com.

68.     According to Equitas' website, in a section titled "WHAT WE DO," Equitas describes itself as follows: "With decades of combined life science experience, EQUITAS has the robust knowledge-base to effectively and efficiently provide insight to support the needs of our partners.  Our work spans the pharmaceutical, medical device and diagnostic industries with expertise across Global Market Access, Pricing and Reimbursement, Launch Strategy, Commercial Excellence, Creative, and more…"  A true and accurate copy of Equitas' website as of June 14, 2018, is archived at archive.org.[3]

69.     Based on the contents of Equitas' classified ad posted in May 2016 (*e.g.*, "global pricing & [market] access (incl European, Asian, & Latin American [markets])") and its own website, it is evident that Equitas has provided services in direct competition with inVentiv since its inception.

70.     In addition, based on the contents of Equitas' May 2016 classified ad (*e.g.*, "Apply to: Equitas Life Sciences, LLC, 30 Cottage St., #30, Cambridge, MA 02139. Attn: HR"), it is evident that essential business operations of Equitas were taking place in or through Meletiche's home in Cambridge, Massachusetts.

71.     On June 3, 2016, Equitas filed an amendment to its Application for Registration with the Massachusetts Secretary of the Commonwealth's office naming Kerry Seagle as the sole

---

[3] https://web.archive.org/web/20180614154736/https://www.equitasls.com/

manager of Equitas.

**VI.    Former Employees Serially Resign and Secretly Transition the Clients to Equitas.**

72.    inVentiv's revenue from Client A (Meletiche's former employer) pursuant to its Master Services Agreement grew significantly from 2014 to 2015.

73.    During his tenure at inVentiv, French spent significant time working on a certain project for Client A ("Project One").[4] Project One, which was being performed pursuant to a SOW issued under inVentiv's Master Services Agreement with Client A, was a large source of revenue for inVentiv.

74.    In early 2016, French reported to his supervisors at inVentiv that work for Client A was winding down. French told inVentiv that this was because Client A's need for consulting services pursuant to its Master Services Agreement had diminished. During the same period, inVentiv also saw a decline in revenue from Client B under its Master Services Agreement. Upon information and belief, French – along with Gogia, Debasitis, Zheng, Atkinson, and Meletiche – caused the decline of inVentiv's revenue from Clients A and B in 2016 under their respective Master Services Agreements by diverting the client work to Equitas during that period.

75.    In November 2015, French asked one of his supervisors if he could start working on a part-time basis. French explained that he wanted to devote more time to completing his doctorate. French's request was approved and, starting in or about February 2016, French switched from a full-time to a part-time schedule at inVentiv.

76.    After French shifted to a part-time schedule, he requested an unpaid leave of absence, claiming that he was dealing with family medical issues that were causing him stress.

---

[4] Like the Clients' names, Project One is a pseudonym developed to protect Client A's identity.

Starting in or about June 2016, French started a period of unpaid leave that lasted approximately six weeks.

77.  Upon information and belief, French modified his work schedule at inVentiv so he could devote more time to his competing enterprise, Equitas.

78.  Starting in January 2016, various members of French's team at inVentiv began submitting their resignations as follows:

   a.  Defendant Gogia resigned as of January 15, 2016;

   b.  Mengran Wang resigned as of February 12, 2016;

   c.  Jon Klein resigned as of March 4, 2016;

   d.  Defendant Zheng resigned as of March 4, 2016;

   e.  Stephen Lu resigned as of March 4, 2016;

   f.  Atkinson resigned as of May 27, 2016;

   g.  Defendant Debasitis resigned as of July 8, 2016; and

   h.  As of July 25, 2016, Defendant French resigned.

79.  Each of the Former Employees cited personal reasons for their departure.

80.  In French's resignation email, his stated purpose for leaving inVentiv was that, "for now I need to focus on my own health and wellbeing (sic)."

81.  In Gogia's resignation correspondence, she explained her departure as follows: "I feel the need to take out some time to both focus on my family and take a break to think about my career direction." In a separate email, Gogia expressly denied that she was planning to work for another company as follows: "I am not seeking employment elsewhere at this time."

82.  In Zheng's resignation email, Zheng indicated that she had been trying to balance her role and responsibilities as a mother of two with her obligations at inVentiv. As for her reason

for leaving, Zheng stated "I feel that I would need to focus more on the family in the immediate near term."

83.     In Atkinson's resignation email, Atkinson stated that the reason for her departure from inVentiv was to enter graduate school.

84.     In Debasitis' resignation correspondence, he stated that "[i]t was a personal reason why [he] sought employment elsewhere."

85.     Upon information and belief, none of the Former Employees left inVentiv for the reasons they provided in their resignation emails.  Instead, upon information and belief, the Former Employees all resigned from inVentiv so they could work for inVentiv's competitor, Equitas.

86.     Indeed, Zheng's LinkedIn profile indicates that Zheng started working for Equitas as Managing Director in or around April 2016, just one month after leaving inVentiv to ostensibly "focus more on [her] family."

87.     Upon information and belief, French orchestrated the departure of at least some of the members of his team from inVentiv and encouraged at least Gogia, Debasitis, Zheng, and Atkinson to resign from inVentiv so that they could join him at his new competing company, Equitas.

88.     None of the Former Employees informed inVentiv that they were leaving inVentiv to work for Equitas, or that they would continue to provide services to inVentiv's Clients.

89.     After all of the Former Employees resigned, inVentiv's revenue from the Clients under their respective Master Services Agreements fell significantly.

90.     In an apparent, coordinated effort to conceal their work for Equitas, after leaving inVentiv – and through the date of this Complaint – none of the Former Employees except for French and Zheng (who has since left Equitas) have updated their profiles on LinkedIn to reflect

any employment following their resignations from inVentiv, much less any association with Equitas.

## VII. inVentiv Discovers the Former Employees' Scheme.

91.     On January 18, 2017, an electronic calendar invite was sent to inVentiv from an employee of Client A.  A copy of the calendar invite is attached as <u>Exhibit 5</u> (the "Calendar Invite").  The Calendar Invite was delivered to the email address that French used when he was employed by inVentiv: _Alan.French@inventivhealth.com_.  Upon information and belief, Client A sent the Calendar Invite to French's old inVentiv email account by accident.

92.     The Calendar Invite was also sent to Gogia at _pmg@equitasls.com_ and Atkinson at _ssa@equitasls.com_.  The apparent purpose of the Calendar Invite was to set up a conference call between Client A, on the one hand, and the French, Gogia, and Atkinson, on the other hand.

93.     On January 19, 2017, an employee of Client A sent an email to French and Atkinson.  A copy of this email is attached as <u>Exhibit 6</u> (the "January Email").  Like the Calendar Invite, the January Email was apparently inadvertently sent to French at the address that he used when he worked for inVentiv.  The January Email was sent to Atkinson at _ssa@equitasls.com_.

94.     The body of the January Email reveals that Client A and Equitas are working together on Project One – which is the same project that French was working on pursuant to a SOW issued under inVentiv's Master Services Agreement with Client A when French was employed by inVentiv.

95.     The Calendar Invite and the January Email were the first indications to inVentiv that the Former Employees were working for Equitas, and that French, Gogia, and Atkinson were working with Client A on Project One through Equitas, instead of through inVentiv pursuant to inVentiv's Master Services Agreement with Client A.

96. Upon information and belief, Defendants have used, or are currently using, inVentiv's Confidential Information in connection with the operation of their competing enterprise and in service of the Clients.

97. For example, forensic analysis of computers that were used by certain of the Former Employees revealed that on July 23, 2016 – two days before the effective date of French's resignation – French accessed certain Confidential Information using his work computer and then immediately inserted into the computer a USB device, which could be used to transport a copy of the Confidential Information elsewhere. On information and belief, French used the USB device to take inVentiv's Confidential Information to use for Equitas' benefit.

98. Additionally, particularly given that Equitas was not in existence prior to November 2015, upon information and belief, Equitas and the Former Employees have capitalized and continue to capitalize on the goodwill that the Former Employees generated on behalf of inVentiv, for the benefit of Equitas. Further, Equitas and the Former Employees have deprived inVentiv the benefit of its bargain with the Clients under their respective Master Services Agreements.

99. But for the misconduct of Equitas and the Former Employees, inVentiv expects that it would have provided additional services to the Clients pursuant to their respective Master Services Agreements in and after 2016.

## VIII. The Former Employees Violate their inVentiv Employment Agreements.

100. By working on behalf of Equitas, a direct competitor, in Massachusetts during their respective noncompete periods, the Defendants breached the noncompete provisions of their respective agreements. (*See* Ex. 1, ¶¶ 4.6, 4.7, 4.2; Ex. 2, ¶ 3(a).)

101. By diverting inVentiv's Clients to Equitas and servicing the Clients through Equitas during their respective nonsolicitation periods, the Former Employees breached the noncompete and nonsolicit provisions in their respective agreements. (*See* Ex. 1, ¶¶ 4.3, 4.2; Ex. 2, ¶ 3(b).)

102. By using inVentiv's Confidential Information to divert and service Clients A and B on behalf of Equitas, and by otherwise taking and/or using inVentiv's Confidential Information, the Former Employees breached the confidentiality provisions in their respective agreements, and their obligations under state and federal law governing trade secrets and unfair competition. (*See* Ex. 1., ¶ 3, 3.3; Ex. 2, ¶ 2.)

103. By hiring and/or soliciting Defendants Gogia, Debasitis, Zheng, and certain other employees to work for Equitas, French breached the no-hire provision in his employment agreement with inVentiv. (*See* Ex. 1, ¶¶ 4.4, 4.2.)

104. On January 24, 2017, following its investigation into Defendants' wrongdoing, inVentiv delivered demand letters to French, Gogia, and Atkinson (together, the "Demand Letters"). The Demand Letters explained that French, Gogia, and Atkinson were working for Equitas in violation of their respective employment agreements.

105. In the Demand Letters, inVentiv requested, *inter alia*, that French, Gogia, and Atkinson deliver a written response by January 27, 2017, and provide the following: (i) a description of their work for Equitas; (ii) written assurances that they would honor their obligations to inVentiv not to solicit or service any clients of inVentiv – including Client A; (iii) written assurances that they would not solicit other employees of inVentiv to leave the company; (iv) written assurances that they would cease and desist from further solicitation of, or work for, inVentiv's clients, including the Clients; and (v) written assurances that they have returned or

destroyed all confidential or proprietary information, as well as other information, that belongs to inVentiv.

106. On February 16, 2017, French, Gogia, and Atkinson responded to the Demand Letters, through counsel, and failed to provide any of the information or assurances as requested in the Demand Letters.

## IV. Harm to inVentiv.

107. The Former Employees, Meletiche, and Equitas have directly or indirectly interfered with the contractual and business relationships between inVentiv and its clients, including by diverting client services away from inVentiv that inVentiv otherwise would have been providing to Clients A & B pursuant to their respective Master Services Agreements and related SOWs with inVentiv.

108. The Former Employees, Meletiche, and Equitas have, upon information and belief, used and will likely continue to use inVentiv's Confidential Information for their own benefit and for the benefit of Equitas, thereby irreparably harming inVentiv.

109. The Former Employees, Meletiche, and Equitas have solicited and served, and will likely continue to solicit and serve, the same clients that the Former Employees serviced and maintained relationships with on behalf of inVentiv. Accordingly, the Former Employees, Meletiche, and Equitas have unfairly competed and will likely continue to unfairly compete with inVentiv by using inVentiv's Confidential Information (including its confidential customer information) and goodwill, for their own benefit and the benefit of Equitas – inVentiv's direct competitor – thereby irreparably harming inVentiv.

110. Given the Former Employees, Meletiche, and Equitas' refusal to comply with their various contractual, common law, and statutory obligations, inVentiv commenced a lawsuit

against Defendants French, Gogia, Debasitis, along with Equitas, Atkinson, and Meletiche, in Massachusetts Superior Court to protect its legitimate business interests. *See inVentiv Health Consulting, Inc. v. Equitas Life Sciences, LLC, et al.*, Civ. A. No. 1781-cv-00660-D (2017) (the "Massachusetts Action"). The Massachusetts court subsequently dismissed Defendants French, Gogia, and Debasitis (along with Atkinson) from the Massachusetts Action, finding that inVentiv's claims against them were subject to the forum selection clauses contained in their various employment agreements. Accordingly, to protect its legitimate business interests, inVentiv is now seeking relief as to Defendants French, Gogia, and Debasitis in this Court. inVentiv is commencing litigation against Atkinson in New Jersey, the designated forum in her employment agreement. The Massachusetts Action is still active as to Meletiche and Equitas.

## COUNT I – BREACH OF CONTRACT
### (Against All Defendants)

111.     inVentiv repeats and incorporates herein by reference the allegations set forth in each of the foregoing paragraphs.

112.     The Defendants' Agreements are valid and enforceable contracts.

113.     The noncompete provision in the Defendants' Agreements is reasonable in scope and duration and is reasonably necessary to protect inVentiv's legitimate and protectable interests in its client relationships and goodwill, as well as its confidential and proprietary information.

114.     The nonsolicit provision in the Defendants' Agreements is also reasonable in scope and duration and reasonably necessary to protect inVentiv's legitimate and protectable interests in its client relationships and goodwill, as well as its confidential and proprietary information.

115.     The no-hire provision in the Defendants' Agreements is also reasonable in scope and duration and reasonably necessary to protect inVentiv's legitimate and protectable interests in its client relationships and goodwill, as well as its confidential and proprietary information.

116. inVentiv performed all of its obligations under each of the Defendants' Agreements.

117. By hiring and/or soliciting Defendants Gogia, Debasitis, Zheng, and certain other employees to work for Equitas, French violated the no-hire provision in his employment agreement with inVentiv.

118. By working for a direct competitor, Equitas, in Massachusetts during their respective noncompete periods, Defendants have violated the noncompete provisions in their respective agreements.

119. By using inVentiv's confidential and proprietary information to divert inVentiv's clients to a direct competitor, Equitas, and by providing services for inVentiv's clients through Equitas during their employment and/or immediately thereafter, Defendants have violated the noncompete, nonsolicit, and confidentiality provisions in their respective agreements.

120. Absent injunctive relief, Defendants will continue to violate their contractual obligations.

121. As a direct and proximate result of Defendants' breaches of their respective agreements, inVentiv has suffered and will continue to suffer irreparable harm and damages. inVentiv is threatened with losing the value of its confidential information, its competitive advantage, income and goodwill in amounts which may be impossible to determine unless Defendants are enjoined and restrained by order of the Court.

## COUNT II – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Against Defendant French)

122. inVentiv repeats and incorporates herein by reference the allegations set forth in each of the foregoing paragraphs.

123. inVentiv and the Former Employees are parties to certain employment agreements,

which place noncompete, nonsolicit, and confidentiality restrictions on the Former Employees.

124.    Defendant French knew of inVentiv's employment agreements with Defendants Gogia, Debasitis, and Zheng, as well as Atkinson.

125.    By intentionally inducing Gogia, Debasitis, Zheng, and Atkinson to violate their respective employment agreements, French knowingly interfered with inVentiv's employment agreements with Gogia, Debasitis, Zheng, and Atkinson without justification.

126.    On information and belief, since French intentionally induced certain of inVentiv's employees to violate their respective employment agreements for the improper purpose of founding a company that competes with inVentiv, and did so using inVentiv's Confidential Information, French intentionally interfered inVentiv's employment agreements with Gogia, Debasitis, Zheng, and Atkinson using improper means and/or motives, and without justification.

127.    As a direct and proximate result of French's tortious interference, inVentiv has suffered and will continue to suffer irreparable harm and damages.  inVentiv is threatened with losing the value of its confidential information, its competitive advantage, income and goodwill in amounts which may be impossible to determine unless French is enjoined and restrained by order of the Court.

## COUNT III – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Against All Defendants)

128.    inVentiv repeats and incorporates herein by reference the allegations set forth in each of the foregoing paragraphs.

129.    inVentiv and its customers enjoy an advantageous business and contractual relationship.  Specifically, valid contracts existed between inVentiv, on the one hand, and Clients A & B, on the other hand, including the Master Services Agreements and various SOWs issued thereunder.

130.     As a result of the Former Employees' work with inVentiv – through which they became the face of inVentiv to many of its clients – Defendants knew of the advantageous business relationship and contracts between inVentiv and its clients (including inVentiv's relationship and contracts with the Clients).

131.     On information and belief, by soliciting at least two of inVentiv's clients (Clients A & B), and diverting their business from inVentiv to Equitas using inVentiv's client relationships and confidential and proprietary information, for the improper purpose of founding a company that competes with inVentiv, and did so using inVentiv's Confidential Information, Defendants intentionally interfered with the existing contracts and advantageous business relationship between inVentiv and its clients using improper means and/or motives, and without justification.

132.     As a direct and proximate result of Defendants' tortious interference, inVentiv has suffered and will continue to suffer irreparable harm and damages.  inVentiv is threatened with losing the value of its confidential information, its competitive advantage, income and goodwill in amounts which may be impossible to determine unless Defendants are enjoined and restrained by order of the Court.

### COUNT IV – TORTIOUS INTERFERENCE WITH PROSPECTIVE FUTURE CONTRACTS
### (Against All Defendants)

133.     inVentiv repeats and incorporates herein by reference the allegations set forth in each of the foregoing paragraphs.

134.     inVentiv and its customers enjoy an advantageous business relationship. Specifically, valid contracts existed between inVentiv, on the one hand, and Clients A & B, on the other hand, including the Master Services Agreements and various SOWs issued thereunder.

135.     Based on the longstanding relationship (contractual and otherwise) between inVentiv and the Clients, inVentiv would have provided additional services to the Clients pursuant

to their respective Master Services Agreements, and entered into additional SOWs thereunder, in and after 2016.

136.     As a result of the Former Employees' work with inVentiv – through which they became the face of inVentiv to many of its clients – Defendants knew of the potential for future contracts between inVentiv and its clients (including the Clients), the potential for future work under existing contracts between inVentiv and its clients (including the Clients), as well as the value of inVentiv's prospective economic advantage with respect to those clients.

137.     On information and belief, by soliciting at least two of inVentiv's clients (Clients A & B), and diverting their business from inVentiv to Equitas using inVentiv's client relationships and confidential and proprietary information, for the improper purpose of founding a company that competes with inVentiv, and did so using inVentiv's Confidential Information, Defendants intentionally interfered with the existing contracts and advantageous business relationship between inVentiv and its clients using improper means and/or motives, and without justification.

138.     The Defendants acted without justification when they induced the Clients to refrain from entering into an additional contract or contracts with inVentiv, such contract or contracts would have ensued but for the Defendants' interference.  Specifically, on information and belief, by soliciting at least two of inVentiv's clients (Clients A & B), and diverting their business from inVentiv to Equitas using inVentiv's client relationships and confidential and proprietary information, for the improper purpose of founding a company that competes with inVentiv, and did so using inVentiv's Confidential Information, Defendants intentionally interfered with inVentiv's expectation that it would provide additional services to the Clients pursuant to their respective Master Services Agreements and obtain additional prospective contracts (SOWs) in and after 2016, using improper means and/or motives, and without justification.

139.    As a direct and proximate result of Defendants' tortious interference with future contracts and inVentiv's prospective economic advantage, inVentiv has suffered and will continue to suffer irreparable harm and damages.   inVentiv is threatened with losing the value of its confidential information, its competitive advantage, income and goodwill in amounts which may be impossible to determine unless Defendants are enjoined and restrained by order of the Court.

## COUNT V – TRADE SECRET MISAPPROPRIATION (N.C. Gen. Stat. § 66-152, *et seq.*)
### (Against All Defendants)

140.    inVentiv repeats and incorporates herein by reference the allegations set forth in each of the foregoing paragraphs.

141.    inVentiv's Confidential Information constitutes a trade secret protectable under North Carolina law.

142.    Specifically, inVentiv's above-described Confidential Information – including its business plans, account plans, business policies, client proposals, client deliverables, financial plans and forecasts, research, pricing information, business forecasts, product information, expert data and reports, business strategies, statements of work, market access strategies, value propositions, client and prospect lists and information, customer contact details, client usage, data sources, industry and company analyses, market information and analysis, methodologies, templates, techniques, and other information relating to inVentiv, its clients (including information regarding its customers' needs and preferences, and how inVentiv addressed or planned to address those needs and preferences, as well as customer-specific pricing structures), and its contractors – comprises inVentiv's confidential information from which inVentiv derives independent economic value by virtue of its not being accessible, through proper means, to competitors like Equitas, which could profit from its use or disclosure.   inVentiv has invested significant time and money into developing its Confidential Information.

143.    inVentiv has taken reasonable steps to protect and maintain the secrecy of its Confidential Information, including, but not limited to, requiring its employees sign confidentiality agreements and using password-protected systems to safeguard sensitive and confidential information.  As a consequence, inVentiv's Confidential Information is not readily accessible to inVentiv's competitors or others.

144.    Defendants' access to and knowledge of the Confidential Information was acquired under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Defendants owed inVentiv both contractually and as employees of inVentiv.

145.    Upon information and belief, Defendants have, through improper means, taken, used, and/or disclosed inVentiv's trade secrets in an effort to lure clients away from inVentiv and/or provide competing services to such clients, in direct violation of their express obligations to inVentiv.  For instance, on July 23, 2016 – two days before the effective date of French's resignation – French accessed certain Confidential Information using his work computer and then immediately inserted into the computer a USB device, which could be used to transport a copy of the Confidential Information elsewhere.  On information and belief, French used the USB device to take inVentiv's Confidential Information to use for Equitas' benefit.

146.    As a direct and proximate result of Defendants' violations of N.C. Gen. Stat. § 66-152, *et seq.*, as described above and their express obligations, inVentiv has suffered and will continue to suffer irreparable harm and damages.  inVentiv is threatened with losing the value of its trade secrets, its competitive advantage, income and goodwill in amounts which may be impossible to determine unless Defendants are enjoined and restrained by order of the Court.

## COUNT VI – TRADE SECRET MISAPPROPRIATION (18 U.S.C. § 1836, *et seq.*)
### (Against All Defendants)

147.    inVentiv repeats and incorporates herein by reference the allegations set forth in each of the foregoing paragraphs.

148.    inVentiv's Confidential Information constitutes a trade secret protectable under federal law.

149.    Specifically, inVentiv's above-described Confidential Information – including its business plans, account plans, business policies, client proposals, client deliverables, financial plans and forecasts, research, pricing information, business forecasts, product information, expert data and reports, business strategies, statements of work, market access strategies, value propositions, client and prospect lists and information, customer contact details, client usage, data sources, industry and company analyses, market information and analysis, methodologies, templates, techniques, and other information relating to inVentiv, its clients (including information regarding its customers' needs and preferences, and how inVentiv addressed or planned to address those needs and preferences, as well as customer-specific pricing structures), and its contractors – comprises inVentiv's confidential information from which inVentiv derives independent economic value by virtue of its not being accessible, through proper means, to competitors like Equitas, which could profit from its use or disclosure.  inVentiv has invested significant time and money into developing its Confidential Information.

150.    inVentiv's Confidential Information is related to its products and/or services, which are used in, or intended for use in, interstate or foreign commerce.

151.    inVentiv has taken reasonable steps to protect and maintain the secrecy of its Confidential Information, including, but not limited to, requiring its employees sign confidentiality agreements and using password-protected systems to safeguard sensitive and confidential

information.  As a consequence, inVentiv's Confidential Information is not readily accessible to inVentiv's competitors or others.

152.    Defendants' access to and knowledge of the Confidential Information was acquired under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Defendants owed inVentiv both contractually and as employees of inVentiv.

153.    Upon information and belief, Defendants have, through improper means, taken, used, and/or disclosed inVentiv's trade secrets in an effort to lure clients away from inVentiv and/or provide competing services to such clients, in direct violation of their express obligations to inVentiv.  Defendants' misappropriation is continuing.  For instance, on July 23, 2016 – two days before the effective date of French's resignation – French accessed certain Confidential Information using his work computer and then immediately inserted into the computer a USB device, which could be used to transport a copy of the Confidential Information elsewhere.  On information and belief, French used the USB device to take inVentiv's Confidential Information to use for Equitas' benefit.

154.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1836, *et seq.*, as described above and their express obligations, inVentiv has suffered and will continue to suffer irreparable harm and damages.  inVentiv is threatened with losing the value of its trade secrets, its competitive advantage, income and goodwill in amounts which may be impossible to determine unless Defendants are enjoined and restrained by order of the Court.

## COUNT VII – UNFAIR OR DECEPTIVE TRADE PRACTICES
### (N.C. Gen. Stat. § 75-1 *et seq.*)
### (Against All Defendants)

155.    inVentiv repeats and incorporates herein by reference the allegations set forth in each of the foregoing paragraphs.

156.    By (i) secretly starting a direct competitor, Equitas, (ii) diverting inVentiv's top clients to the new venture using inVentiv's trade secrets and other confidential information, (iii) capitalizing on inVentiv's goodwill with those clients in violation of their employment agreements and trade secret law, (iv) misappropriating and misusing inVentiv's trade secrets and confidential information, (v) conspiring to bring about mass resignation from inVentiv, (vi) usurping Plaintiff's business opportunities, (vii) tortiously interfering with Plaintiff's current contracts, future contracts, and prospective economic advantages, and/or (viii) violating the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152, Defendants have engaged and are engaging in unfair and deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1, *et seq.*

157.    Defendants' misconduct, described above, was in or affecting commerce.

158.    As a direct and proximate result of Defendants' unfair and deceptive trade practices, inVentiv has suffered and will continue to suffer irreparable harm and damages.  inVentiv is threatened with losing the value of its trade secrets, its competitive advantage, income and goodwill in amounts which may be impossible to determine unless Defendants are enjoined and restrained by order of the Court.

### COUNT VIII – CIVIL CONSPIRACY
### (Against All Defendants)

159.    inVentiv repeats and incorporates herein by reference the allegations set forth in each of the foregoing paragraphs.

160.    Defendants and each of them agreed to act together and in concert with one another,

pursuant to a secretive, common plan, scheme and design, to disrupt and injure inVentiv's business, breach the Former Employees' employment agreements with inVentiv, misappropriate and/or misuse inVentiv's Confidential Information, and ultimately divert business from inVentiv, all in knowing breach of the Former Employees' contractual, common law, and statutory obligations, as well as Equitas' common law and statutory obligations.

161.    By their conduct described above, Defendants committed tortious acts in furtherance of their plan.

162.    As a direct and proximate result of Defendants' wrongful conduct, inVentiv has suffered and will continue to suffer irreparable harm and damages.  inVentiv is threatened with losing the value of its trade secrets, its competitive advantage, income and goodwill in amounts which may be impossible to determine unless Defendants are enjoined and restrained by order of the Court.

## COUNT IX – BREACH OF FIDUCIARY DUTY
### (Against French)

163.    inVentiv repeats and incorporates herein by reference the allegations set forth in each of the foregoing paragraphs.

164.    As a managing director and team leader at inVentiv who was allowed to access inVentiv's confidential information, French owed certain fiduciary duties to inVentiv.

165.    In his role as a managing director and team leader charged with taking lead on all projects for Clients A and B, French dominated, controlled, and influenced inVentiv's business, communications, and decision-making with respect to Clients A and B.

166.    French occupied a position that was unique and influential to inVentiv's operations, and as such he owed inVentiv a duty of trust and confidence (a) not to breach his noncompetition obligations, (b) not to breach his nonsolicit obligations, (c) not to breach his no-

hire obligations, (d) not to interfere with, exploit, or divert inVentiv's customer goodwill, in particular with respect to Clients A and B, and (e) not to take, use, or disclose any confidential and proprietary information.

167.     French has violated his common law duty arising from his relationship and his employment agreement in that, while employed with inVentiv, he secretly (a) planned to leave the employ of inVentiv to start a competing company, Equitas, (b) solicited and encouraged the other Former Employees to leave inVentiv and work for Equitas, (c) improperly used inVentiv's confidential information and customer goodwill to divert Clients A and B to Equitas, and (d) otherwise took inVentiv's confidential information.

168.     As a direct and proximate result of French's wrongful conduct, inVentiv has suffered and will continue to suffer irreparable harm and damages.  inVentiv is threatened with losing the value of its trade secrets, its competitive advantage, income and goodwill in amounts which may be impossible to determine unless French is enjoined and restrained by order of the Court.

## COUNT X – CONSTRUCTIVE FRAUD
### (Against French)

169.     inVentiv repeats and incorporates herein by reference the allegations set forth in each of the foregoing paragraphs.

170.     As a managing director and team leader at inVentiv who was allowed to access inVentiv's confidential information, French owed certain fiduciary duties to inVentiv.

171.     In his role as a managing director and team leader charged with taking lead on all projects for Clients A and B, French dominated, controlled, and influenced inVentiv's business, communications, and decision-making with respect to Clients A and B.

172.    French occupied a position that was unique and influential to inVentiv's operations, and as such he owed inVentiv a duty of trust and confidence (a) not to breach his noncompetition obligations, (b) not to breach his nonsolicit obligations, (c) not to breach his no-hire obligations, (d) not to interfere with, exploit, or divert inVentiv's customer goodwill, in particular with respect to Clients A and B, and (e) not to take, use, or disclose any confidential and proprietary information.

173.    French has violated his common law duty arising from his relationship and his employment agreement in that, while employed with inVentiv, he secretly (a) planned to leave the employ of inVentiv to start a competing company, Equitas, (b) solicited and encouraged the other Former Employees to leave inVentiv and work for Equitas, (c) improperly used inVentiv's confidential information and customer goodwill to divert Clients A and B to Equitas, and (d) otherwise took inVentiv's confidential information.

174.    By engaging in the misconduct, described above, French took advantage of his position of trust and confidence at inVentiv to benefit himself.

175.    As a direct and proximate result of French's wrongful conduct, inVentiv has suffered and will continue to suffer irreparable harm and damages.  inVentiv is threatened with losing the value of its trade secrets, its competitive advantage, income and goodwill in amounts which may be impossible to determine unless French is enjoined and restrained by order of the Court.

## PRAYER FOR RELIEF

**WHEREFORE**, for the reasons set above, Plaintiff inVentiv Health Consulting, Inc. prays for the following relief:

A. Order, adjudge and decree that Defendants have materially breached their employment

agreements with inVentiv;

B.  Permanent injunctive relief prohibiting Defendants from using or disclosing inVentiv's Confidential Information, including, without limitation, inVentiv's current and prospective customers, current and future functionality, features and pricing of inVentiv's products and services, areas of inVentiv's corporate development and investment, competitive data and technical information for differentiating inVentiv's products and services from those of inVentiv's competitors, and know-how and best practices, as well as other confidential and proprietary information belonging to inventive.

C.  Judgment for inVentiv on all Counts in this Complaint, and an award of damages to inVentiv in an amount to be determined at trial, together with interest, costs, and attorneys' fees; and

D.  Award of all other relief that this Court determines is appropriate.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.**

Dated June 22, 2018.

Respectfully submitted,

| | |
|---|---|
| Stephen D. Riden, BBO No. 644451 | *s/ F. Marshall Wall* |
| *sriden@beckreed.com* | F. Marshall Wall |
| Russell Beck, BBO No. 561031 | N.C. State Bar No. 26804 |
| *rbeck@beckreed.com* | *mwall@cshlaw.com* |
| Hannah T. Joseph, BBO No. 688132 | Cranfill Sumner & Hartzog LLP |
| *hjoseph@beckreed.com* | P.O. Box 27808 |
| BECK REED RIDEN LLP | Raleigh, North Carolina 27611-7808 |
| 155 Federal Street, Suite 1302 | Telephone (919) 828-5100 |
| Boston, Massachusetts 02110 | Facsimile (919) 828-2277 |
| Telephone: (617) 500-8660 | |
| Facsimile: (617) 500-8665 | Local Civil Rule 83.1(d) Counsel |

*Pro Hac Vice Motions to be Filed*

COUNSEL FOR INVENTIV HEALTH CONSULTING, INC.